May it please the court, I yield countly on behalf of the appellant Bickerstaff. Bickerstaff is a boutique actuarial firm. In this case it arises out of a question of insurance coverage. The parties agree that there was coverage provided the parties disagree on the applicability of an exclusion. I don't want to repeat through the facts except for those that will help in a chronological way to develop the argument. I apologize, I know the court has read everything. The real question here is whether or not the exclusion, which even if there were coverage in the first instance, the exclusion says that if the damages that are being sued for when the coverage is invoked arise from the insolvency or the bankruptcy of either the insured, which would be Bickerstaff, or some other person, in this case Bickerstaff's client, coverage is avoided by Zurich, the carrier. So the question is to the breadth of that clause and the applicability of that clause to the unique facts in this case. The client in this case was a reciprocal trust, which is kind of a unique animal in the insurance world. When you hear the word reciprocal, that's because the entity can go back against its policyholders and assess them if there's a shortfall. As a consequence, in terms of the accounting for a reciprocal and its solvency, and solvency has multiple definitions, but for purposes of the case and the argument, we're going to refer to statutory accounting, which is deemed to be very conservative. The reciprocal tends to run closer to the margin than perhaps other insurance companies. So with that background, I'll note that Caduceus was formed in 1975. It was a Florida medical malpractice trust started by doctors who banded together to try and create an alternative to the traditional market that started in the mid-'70s when there was a crisis nationally in medical malpractice. In any event, Caduceus went along, and we get to the year 1993. And the reason that's significant is because this decision was determined on the pleadings, and the pleadings attach the expert opinion of a CPA who was a longtime Ernst & Young partner who was utilized by the Florida Department of Financial Regulation, which controls insurance companies and vehicles in Florida. And this fellow, Mr. Butner, said in his opinion that this reciprocal, Caduceus, was insolvent no later than December 31st of 1993. The reason that's important is because the defendant, Bakerstaff, my client, did not render his first word product relevant to this case until the spring of 1995. The entity wasn't solvent. Bakerstaff hadn't begun to do the work that's the subject here, which are rate studies and reserve studies. And I guess I should lay out again, just so I'm clear, that the case was brought that generated this litigation by the Florida receiver in the year 2002, and they sued the accountants for Caduceus. That lawsuit started in 2004. The accountants sued my client in 2008 in a contribution claim over. I'll go back to the analogy. So from early 1995 through 1999, the accountants, I'll call Spear Safer, they merged with another firm, but their reference in my brief is SS, but it's Spear Safer. They were there at the same time as my actuaries, Bakerstaff. Bakerstaff would render its reports as to its evaluation of the range of possible selection for where the reserves could be in terms of this entity, and then use its rate studies, use that information as part of its duties to make recommendations as to where Caduceus, for purposes of its accumulating losses, where rates needed to be. And that would be forwarded to the company and were available to the accountants. The accountants, in turn, had different duties. Their duties were far more extensive than the actuaries. They had to sign the opinion, and if you go through the pleadings against the accountants, which are, of course, what generated the third-party action, you will see that the claims against them are multiple times beyond just the reserve issue and the rate study issue. But they were accused of, among other things, not having people who were sophisticated in this area, not having people who knew what their responsibilities were in terms of evaluating the range and reporting it up to the company. Some of the other things that have nothing to do with the actuaries that were alleged against them relate to the fact that they didn't properly account for reinsurance and treat it as an asset, something that wasn't. And the sum and substance was the Florida Department ultimately said that their performance was so bad that they were suing. Again, I skipped ahead there, but we get to the year 1998, and Caduceus decides, because the national market is too competitive, because they're losing doctors, because they can't compete, they've got to find a partner. Well, they can't find a partner, but they make a deal with a company from Napa called the Doctor's Company. The Doctor's Company is a successful doctor-run company that also started in 1975, and the deal is they transfer their book of business, and the Doctor's Company agrees to pay them over the next three years for the profitability of that book of business. We get to the year 2000, and the Doctor's Company, according to a complaint the receiver brought against the Doctor's Company, didn't pay. Caduceus runs low on funds, declares itself to be insolvent, goes to the Florida Department and says, put us in receivership. So 2000, the declared insolvency. Well, it's declared. That's important, right, because the allegation here, as I understand it, is that Vickerstaff, by its actions or omissions, contributed to the worsening condition. Depending on which pleading you're reading, Your Honor, I'm going to have to get into that. But 2000 is important to note that that's when Caduceus went to the department and said we're insolvent and was taken over by the receiver. And one thing I want to address right now is when a receiver steps in, and you have the Florida statutes all supplied to you here, they're similar to the national receiver statutes that apply in almost every state. The receiver steps into the shoes of the company. So the inference that's created by Zurich that these causes of action arose in 2000 because the receiver was appointed and because they declared insolvency overlooks the fact that if causes of action existed prior to the appointment of the receiver, the appointment of the receiver is not significant as to when those causes of action occurred. But to get back on the trail. But you've painted a long picture of actions, but isn't the simple issue that Vickerstaff's alleged to have caused, in part, the worsening condition that results in a declared insolvency and the exclusion is for claims arising out of insolvency? That's Zurich's position, I disagree. And the reason I disagree and the reason I'm going through this is because there are different damages. First of all, the receiver who brought the action against the accountants and their expert have alleged throughout consistently the company was insolvent. The company was insolvent before Vickerstaff ever worked there. The company was insolvent based upon the condition of the company in 1993. How are you using the term insolvent there? What do you mean by that? We could use the standard insurance definition, Black's Dictionary, or the Florida statutes. Insolvency means that the company is not going to be able to pay its claims with its assets. As of today, whatever day that might be, the liabilities exceed the assets. Right? But they're working to get themselves out of that condition. And by 2000, finally, it's a declared insolvency because they were not able to work themselves out of that condition. If I can just delve into the facts a little more. Sure. I was going through the record, particularly the supplemental record, and it bears mentioning, and it's not cited in anybody's brief, but if you go to their supplemental record, page 485, you'll see a chart that the Florida receiver's expert lays out his view of what the insolvency was for each year from 1993 to 1999. And just in order of magnitude, it started at about $2.6 million. It went up the next year to 3.5. It went down the next year to 2.2. And it ended up at 99 and 3.6. The doctor's company was two things happened that I didn't get to. Caduceus and then the Florida receiver, because this is a reciprocal, issued an assessment in 2002 or 2003 against all of its members for roughly $15 million, and roughly $14 million in change came in. Four years before Vickerstaff sued. And our point is this. That money came in, and it was used to pay all the claims and everything that Caduceus was liable for. The second thing that happened was that in 2002, the receiver sued the doctor's company, saying, you failed to perform on the contract, and you owe us money based on that contract when you took over our book. The result of that lawsuit was a recovery by the receiver on behalf of Caduceus of at least $17.5 million, and one of the pleadings that's attached says it was $20 million. When that money came in and was affirmed in late 2006, the receiver went to the Florida court, controlling the delinquency proceeding, which these things are referred to as, and asked for permission to return $11 million to the doctors who had been assessed, because everything was paid for. Well, at that point, they still had the lawsuit against the accountants. The accountants came in and moved for summary judgment and said, wait a second, you sued us. You got all your money. You don't need to sue us. The same expert put in a new set of papers opposing it and said, well, wait a second, there's still damages, because even though we've cured that, we've got damages for lost profits, because we could have charged more during the 95, 6, 7, 8 years had you done your job, and had we charged more, we could have done a better negotiation with the doctor's company. And I mentioned those numbers, you know, the $2.6 million to $4.5 million. In contrast, with the $15 million of assessment, $15 million surely is going to cure a $4.5 million shortfall. Then the doctor's settlement comes in, money's returned, so the issue then is, are they insolvent? No suit against my client at that point in time. They lose the motion, and as a consequence, they decide to sue my client. My client comes in, and there are three sets of pleadings. One of the early pleadings alleges that our reserve work caused the insolvency. The later pleadings do not. The later pleadings point to the damages I just referenced and say that because we've been sued for the lost profits and the poor negotiating position and the cost of recovering it in liquidation, which, by the way, liquidation is not the same as insolvency. Liquidation means ending, and they weren't insolvent. When they recovered all this money, they were able to give it back, so. What is the status of the other lawsuits now? The lawsuit against Bickerstaff is over. The underlying lawsuit. Pardon me? The underlying lawsuit. Yeah, the lawsuit against Bickerstaff is dismissed in Florida, and I can't. Dismissed, so there was no judgment against your client? That's correct. So we're only talking about duty to defend. Right. After the case was dismissed, our client was sued by Zorich for the cost of defense, and we paid the judgment because the judge said we were. The judge below said we were sued for causing the insolvency. He relied on the earlier pleading that's supplanted by the operative pleading, which says we're being sued because if we'd done a better job, they would have made more money. Now, there's a big difference between suing somebody saying they would have made more money and saying they caused insolvency. But the question here is whether the suit against you arose out of the insolvency. There's an exclusion for coverage, right? They're suing you for the amount that they spent to defend you in this lawsuit. Correct, and we paid them after they sued us. Okay, so you paid them. Now you want it back. Yes. Right. So the really small question we're addressing here and have to decide is whether the lawsuit, the underlying lawsuit, arose out of the insolvency. If it did, then you're not talking about it. Now, the question is whether the damages alleged against Pickerstaff arise out of insolvency. And our position is that the claim has to arise out of insolvency, not the damages, the claim. No, actually, the exclusion only runs to damages, Your Honor. It doesn't run to claims. Everybody admits we're covered for malpractice, which they allege. Well, I think you're confusing terminology. The underlying claim against you for which Zurich defended you is malpractice. Okay, that's malpractice. Yes, Your Honor. Okay, so did that claim arise out of the insolvency? That's the question, right? Right, and our position is absolutely not. A, there's no insolvency at the time the operative pleadings have to be adjudicated, and, B, the specific claim against us in the Second Amendment complaint is that, but for our work, they would have made more money. But for our work, there would have been a stronger negotiating position and we would have been able to get more money. We're not accused by the accountants of causing the insolvency. And, you know, it's fact-specific. You can't just use the labels. Well, a receiver brought the lawsuit. Receivers are involved in insolvency. Therefore, this case is our own. Right, and under California law, the duty to defend has to do with what the allegations are. The duty to defend extends to the allegations and anything that might come from them. The pleadings are malleable. Well, I mean, when the company is deciding whether or not to defend under a reservation of rights, they look at what they have in front of them, and then that's where the duty to defend comes from. Right, and at the time they made this motion for summary judgment, there was no insolvency. You know, this policy doesn't say when the insolvency has to be determined. If you argue it was when the company was first found to be insolvent, that would be 1993. If you say, oh, no, it's not time-specific, then you can't have it both ways. Well, it has to arise out of, so you have to determine what arise out of means. Well, I think arise out of means it came out of insolvency. And what I'm arguing is the fact that a receiver was appointed doesn't mean it arose out of insolvency. The actions that the receiver brought against the accountants who brought them against us arose out of a claim that there was malpractice that caused lost profits, not a claim that we caused the insolvency. Well, the lost profits are one of many, arguably, factors that lead to the ultimate declaring of insolvency. If you read their expert's opinion, he breaks it out and has a specific breakout of the difference of those damages, because he was challenged on that. That's number one. And, you know, I ran out of time. All right. Thank you, Counselor. May it please the Court. Stephen Cope of Barbonet, Ventura, appearing on behalf of Zurich Specialties Limited. First, I'd like to clarify some points from the prior discussion from appellants. Zurich did not file its declaratory relief action after the case was dismissed against Bickerstaff. It actually filed its declaratory relief action after agreeing to defend at a reservation of rights for this specific issue. It then defended him all the way through the time it got the order in this case that held that there was no coverage, and after that point, it dismissed. And it's our understanding that it's at that point that the case was dismissed, probably because there was no insurance coverage for Bickerstaff, I'm guessing, at that point. The other issue here is that the judge, there's comments in the papers, and he argues again here, that the district court relied on an outdated pleading to find that the underlying case arose out of insolvency. That's simply not true. If you look at the papers, the judge relied on undisputed fact, uncontroverted fact 39, which Bickerstaff did not dispute, which was an admission from Bickerstaff's own counterclaim in this action, which said that they had been sued for setting reserves leading to the insolvency. And there were three sets of pleadings filed by the accountants in this case. It's notable the first two actually do mention insolvency. The third one, which was filed three months approximately after our DEC relief action, is artfully pled to avoid using the word insolvency. So there's, the reality is the receiver's complaint against the accountants is entirely couched, as you noted, as that the actions of the accountants caused them to become financially impaired to the point of surpassing insolvency, statutory insolvency. All three of their causes of action contain the identical proximate cause allegation, and these were never amended. These are the claims against Spears Safer. They state that Spears Safer enabled Caduceus to continue to operate past the point where it became statutorily insolvent, thereby proximately causing Caduceus to suffer damages. That is in all three of the damage allegations against the accountants. And that's important because the third-party complaint against Bickerstaff is a single cause of action for contribution. Bickerstaff had a contract with Caduceus, who did not sue them. So their entire claim is saying if we are found liable by the receiver, you're responsible for it. So it passes through, meaning those three allegations in the unamended receiver's complaint are the sole issue really here, no matter what kind of dancing around Spears Safer did in their various amended complaints. The other issue, and I believe Justice Wardlaw is hitting on this, is we keep hearing about how the key issue in terms of damages is whether, or in terms of this case, is whether the damages arose from insolvency. The word damages does not appear in the exclusion we're dealing with. The exclusion very clearly states and very concisely states that the Zurich policy shall not apply to claims for or rising out of the insolvency or bankruptcy of the insured or any other person, firm, or organization. It's saying any claims arising out of them. And California courts, as the district court pointed out, have interpreted arising out of extremely broadly, and it does not require, as we see in their pleadings, that insolvency be an element of the claim or underlying it. It only requires a minimal causal connection or incidental relationship. And that's been repeatedly held by California cases throughout. The receiver filed the suit against Spears Safer under the Florida statutes, and specifically under a Florida statute that allows them to sue entities that misreported a material fact that jeopardized the safety and soundness of an insurer or was a significant cause of the insurer being placed in a receivership. That's Florida Statute 631.157. And the allegations that the receiver made against Spears Safer were all that the, while they do allege that the caduceus was impaired in 93, as I believe Justice Kavanaugh pointed out, the allegation is they were insolvent for the entire period from 93 to 2000, and they only had to declare insolvency in 2000. There's really no dispute in the record that for the entire period from 93 to 2000, they were acting in an insolvent position and a financially impaired condition. And it doesn't make any sense, actually, that the receiver would be suing the accountants for driving them into insolvency if the insolvency was over in 1993. These accountants did not start to do any work for them until 1995. The court properly found that in this case, the claims against Bickerstaff, which arise from the claims against Spears Safer, arise from insolvency. What you have in this case is a very simple situation. This is a lawsuit filed by the receiver for an insolvent insurer, specifically alleging the conduct of the insured contributed to the insolvency. Based on the broad language that you see in all the cases interpreting arising out of, and the multiple cases that have enforced insolvency exclusions, these, the case is just a simple one. This is not one that requires the complication that you've seen in the papers from the opposing party. The issue about the lost profits, there's also been a misrepresentation about what Mr. Butner opined in his opinions. He actually, although he says the insolvency occurred in 1993, he goes on to state later that the insolvency continued until Caduceus was placed into liquidation on January 3, 2000. So this concept that the liquidation, the insolvency was somehow over and irrelevant in 93 is not supported by Mr. Butner's claim, and also the claim that the lost profits are somehow unrelated is also not supported by Mr. Butner's own allegations. The allegation he states in his opinions are that if not for Caduceus deteriorating financial condition and the uncertainty surrounding Caduceus at the time of the doctor's company transaction, more policyholders would likely have become policyholders, thereby causing TDC, the doctor's company, to pay larger cumulative profits and new business fees to Caduceus. So what he's saying there is really the same thing that they've said throughout, which is if you've done your job right, we would have made more money. We wouldn't have had declared insolvency. This whole thing would have not happened. So this is a professional liability policy? Yes. What is the policy, the insurance policy rationale for the exclusion for expenses arising out of insolvency? Well, I think this case is a perfect example of why that would be the case. You have a situation where when you have a client that gave advice to some large corporation, you don't want that corporation to be responsible if that corporation goes bankrupt and tries to shift their entire bankruptcy debt to you. And the reason that is because you can give the most perfect accounting advice or legal advice to a company so you haven't committed malpractice, and they could nevertheless be insolvent and then turn around and try to sue you based on that. And they can drag you in and say that, yeah, your advice drove us into insolvency. It's a huge, this is an example of exactly why you wouldn't insure that. And if you did, it would certainly cost considerably more than a policy without this type of exclusion. Is this a standard policy exclusion in the industry? It's one of several. I mean, there's a lot of insolvency exclusions out there, and there's two in this policy, actually. The other one is not at issue in this case because it involved placing insurance, which is not at issue here. You know, we know that the duty to defend is broader than the payment on the merits of cause. What in the complaint could possibly impose liability on you? We look at the complaints and we look at what the extensions from the complaint might be, and that really determines whether you have a duty to defend. Right. The interpretation here was that if you didn't, we're not disputing that if there was no insolvency exclusion, that the allegation that by Spear Safer, that if we're liable for malpractice that caused this insolvency, it's because we relied on your opinions, and that's why they really went into insolvency. But what you have to do is you look at the initial insuring grant that says, yes, we cover you for malpractice, and then you have to look at the claims that are forced, if they're conspicuous and unambiguous, like this one. And they are, and you have one like this that is, applies to claims arising out of insolvency. Our position and the one the Court agreed with is that in that situation, this claim, which fairly clearly arises out of the insolvency of Caduceus, would be exactly what would be excluded, and therefore, you wouldn't have a duty to defend, because although the duty to defend is broad, it does not extend to defending claims that are not even potentially covered. And that's why, when you determine that there never was a potential for coverage here, due to the exclusion, that therefore, there never was a duty to defend, which is why we got that ruling from the Court. One of the issues you have in this case is that their allegation is that it's outrageous, and it's outrageous, and it's outrageous that we didn't defend them when there's clearly an allegation of malpractice, and that's what the policy is meant to cover. And the reality of that position is that just assumes, then, that the exclusions are all unenforceable. Because obviously, as you've just pointed out, exclusions really only come into play if there is coverage under the insuring grant. And so pointing out that the policy is meant to cover malpractice does not actually lend any credence to the situation at all. There is a large discussion in the papers about concurrent causation, but I note that hasn't been raised in the appellant's argument at this point. I would just say that the papers on that are fairly clear. We believe that this Court's already ruled that in the Conestoga case, that if the causes alleged are not independent and separate, that the concurrent causation would not apply. I think the district court adequately addressed that in its own opinion as well. Do you have any further questions? No. Thank you, counsel. If you read the exclusion, and your point was, is it just claims? No, it's claims, costs, charges, and expenses. I summed up as damages. I'm just going to ask, I know the Court will read the briefs carefully, but lastly, the second Bittner report that I mentioned, where it was post the recovers, you'll find that at the supplemental record at page 495, where he breaks out the part of the damages that only relate to the lost profits and not for the cure of insolvency. Thank you, Your Honor. All right. Thank you very much.
judges: Kavanaugh, Fletcher B. , Wardlaw